# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Michael J. Ferola, # 291941, | ) CIVIL ACTION NO. 9:15-2006-RBH-BM |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **REPORT AND RECOMMENDATION** |
| | ) |
| Willie Eagleton, James Slight, | ) |
| NFN Betha and NFN Styles, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

This action was filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983. Plaintiff, an inmate with the South Carolina Department of Corrections (SCDC), alleges violations of his constitutional rights by named Defendants.

The Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on June 17, 2016. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on June 20, 2016, advising Plaintiff of the importance of a dispositive motion and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case. Plaintiff thereafter filed a response in opposition to the Defendants' motion for summary judgment on June 30, 2016, to which the Defendants filed a reply memorandum on July 7, 2016. Plaintiff filed a sur reply on July 22, 2016.



The Defendants' motion is now before the Court for disposition.[1]

### Background and Evidence

Plaintiff, a frequent filer of litigation in this Court, alleges in his verified Complaint[2] that in October 2013 he was moved into Room 211B with Inmate Phillip Crawford. Plaintiff alleges that Crawford was serving time for "multiple assaults over several years", while another inmate in Room 211B was serving a life sentence. Plaintiff alleges that he submitted a request to the Defendants Betha (a case manager) and Styles (a case worker) to be moved to another room because he and his roommates were not compatible under the SCDC's classification plan. Plaintiff further alleges that even though SCDC policy allows the Warden to initiate an emergency housing change due to inmate incompatibility, that Betha and Styles informed him that room changes were done at annual reviews only.

Plaintiff alleges that he "placed" Styles and Betha on notice that he was "in imminent danger from inmate Crawford based on his threats of physical violence toward Plaintiff", but that Styles and Betha refused to take any corrective action. Plaintiff alleges that he attempted to file a grievance about not being moved to another room, but was informed that cell assignments are not grievable issue. Plaintiff alleges that, also in October 2013, he spoke with the Defendant Sligh[3] (Regional Director) when he saw Sligh in the gym to explain his problem with his roommates and

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se litigants are considered as affidavits with respect to any factual allegations contained therein that are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

[3]Plaintiff spells this Defendant's last name as "Slight" in his Complaint. However, his name is Sligh.



that Styles and Betha were refusing to move him to a different cell, and that Sligh told Plaintiff he would speak with the Defendant Eagleton (the Warden) about having Plaintiff moved to another room.  Plaintiff alleges that thereafter, in November 2013, he was escorted to Eagleton's office by Betha, where Eagleton asked him what the problem was between Plaintiff and his roommates. Plaintiff alleges that he told Eagleton he was being threatened by his roommates, that he had been "pushed" on two occasions by Crawford, and that Styles and Betha were refusing his request to be moved to another cell.  Plaintiff alleges that Eagleton told him that he would have Plaintiff moved to another room or would move his current roommates.

Plaintiff alleges that after a week went by and neither he nor his roommates had been moved, he submitted a request to Eagleton again requesting to be removed, but that he received no response.  Plaintiff alleges that approximately two (2) months later, on January 11, 2014, he was assaulted by Crawford, which resulted in Plaintiff being injured "from being punched by Inmate Crawford" as well as by being gassed (apparently by a "Sgt. Freeman").  Plaintiff alleges that Crawford was placed in lockup and subsequently pled guilty to punching the Plaintiff, and that although Plaintiff was also initially charged with fighting, the case against him was dismissed since he "never raised [his] hands or threw a punch".  See also, Plaintiff's attached Exhibit E to his Complaint.  Plaintiff alleges that on January 13, 2014 he filed another grievance (ECI-59-14) about the SCDC classification being violated and about being assaulted by Crawford as a result.

Plaintiff alleges that after being assaulted by Crawford, he was moved to a different room per order of the Defendant Eagleton.  Plaintiff alleges that Sligh, Eagleton, Betha and Styles had all been placed on notice that he was in danger of being assaulted, and "failed to act".  As a result, these Defendants were deliberately indifferent to Plaintiff's safety and violated his constitutional rights.  Plaintiff seeks monetary damages, as well as an order from this Court revising



3

the SCDC classification policy.

Plaintiff has attached as exhibits to his Complaint a copy of a grievance (TYRCI-641-09) he filed on September 9, 2009 while he was housed at the Tyger River Correctional Institution. This grievance apparently dealt with a classification issue involving a different roommate. The Step 2 response to this grievance[4] noted that Plaintiff had been moved from the cell (and roommate) at issue on October 2, 2009, and by that point (2013)[5] Plaintiff was even housed at a different prison (the Evans Correctional Institution - ECI), and that therefore the grievance was resolved.[6] Plaintiff's exhibits also include a copy of a Step 1 grievance (ECI-59-14) which is dated January 13, 2014. In this grievance, Plaintiff complains that as a result of SCDC policy not being followed he was assaulted on January 11, 2014 by Inmate Crawford. Under the "Action Requested" portion of this grievance, Plaintiff asked that the SCDC comply with the classification policy on housing of prisoners. Plaintiff has also included a copy of his Step 2 appeal of this grievance, which reflects the following disposition of Plaintiff's appeal:

> Your concern has been investigated. It does not appear the incident on January 11, 2014 was the result of non-compliance with the Classification policy but your own aggressive action to anger and provoke Inmate Crawford to feel threatened. There is no evidence of "deliberate indifference" since you spilled water on Inmate

---

[4]This Court can take judicial notice that under the SCDC Grievance Procedure an inmate commences the grievance process by filing a Step 1 grievance form, and if the grievance is denied by the Warden (Step 1), the inmate may then appeal the Warden's decision by filing a Step 2 appeal with the Division Director of Operations. See SCDC Inmate Grievance System Procedures, GA-01.12 (May 12, 2014), Nos. 13.7 through 13.10; Hall v. Virginia, 385 F.3d 421, 423, n. 3 (4th Cir. 2004) [Court may take judicial notice of information publically available on official government website]; see also Branton v. Ozmint, No. 08-2306, 2009 WL 1457144, at * 2 (D.S.C. May 22, 2009); Jones v. Kay, No. 07-3480, 2007 WL 4292416, at * 5 (D.S.C. Dec. 5, 2007); Jenkins v. South Carolina Dept. of Corrections, No. 05-2800, 2006 WL 1083563, at * 5 (D.S.C. Apr. 18, 2006).

[5]The Step 2 appeal appears to be dated November 19, 2013.

[6]It is not clear why this earlier grievance has been submitted as an exhibit in this case, since it deals with a different prison and different cell mates.



Crawford's Bible and followed him out of the cell when he reported it. The officer gave you directions to stop following Inmate Crawford, but you refused to comply; therefore, you initiated the fight. Therefore, your grievance is denied.

Plaintiff has also submitted a copy of what purports to be the SCDC cell assignment guidelines as well as some documents relating to the dismissal of the charges that were filed against him as a result of this incident. See generally, Plaintiff's Verified Complaint, with attached exhibits.

In support of summary judgment in this case, the Defendant Brenda Styles has submitted an affidavit wherein she attests that she is a case worker at ECI, and that in issuing her affidavit she has reviewed the Complaint filed in this case as well as Plaintiff's inmate records, Officer Freeman's reports, and Inmate Crawford's affidavit. Styles attests that cell reassignment requests are frequently filed by inmates for various reasons, but that unless exigent circumstances exist, all roommate changes are performed on an annual review. Styles attests that disagreements between cell mates are common, but that in her experience most complaints do not involve a Request for Protection or a Report to the Duty Officer and an Incident Report. Styles further attests that inmates are known to collude with each other in order to try to get a cell change.

Styles attests that it is her practice to refer cell mate disputes to the Wing Lieutenant to ensure that the dispute is properly documented, that she has searched every incident report from the Lieutenant for the Plaintiff's Unit (Lt. Hips) for the time period related to Plaintiff's complaint (2013 and 2014), and could not find any incident report or request for protective custody where the Plaintiff followed up on his complaints about his cell mate. Styles attests that complaints involving requests for protective custody are a strong indication that an inmate actually feels threatened and is not simply angling for a new cell assignment, and that based on her decades of experience with the SCDC, her personal practices for dealing with inmate complaints about a cell mate, her recollection of these events, her actions at the time, and her review of the documents related to this



matter, she was not aware at any time prior to the altercation between Plaintiff and Crawford that either Crawford or Ferola were under threat of substantial risk of serious harm due to being housed in a cell together.  See generally, Styles Affidavit.

The Defendant James Bethea[7] has also submitted an affidavit wherein he attests that he is the Classifications Manager at ECI, and is familiar with the records and allegations relevant to Plaintiff's complaint.  Bethea attests that at all times relevant to this case Plaintiff was housed in the Cheraw B Side Unit, which is where Prison Industries and Handicap Inmates are housed.  Bethea attests that inmates housed at Cheraw B Side are the least likely to engage in violence because they do not want to lose their position with Prison Industries or because that are handicapped.  Bethea further attest that he takes inmate safety very seriously, and that if an inmate comes to him with issues that cause him to believe the inmate is under immediate threat of serious harm, he will do what is necessary to see that the inmate is placed in the SMU immediately - the inmate will not be allowed to return to his room or the yard.

Bethea attests that inmates are constantly seeking new cell assignments, and that disagreements between cell mates are also a common occurrence.  Bethea attests that, in his experience, most complaints about cell mates that case workers receive which do not involve a Request for Protection or a Report to the Duty Officer and an Incident Report are either merely an attempt to get a new cell or cell mate or are related to minor disputes resolved by the inmates themselves without further issue.  Bethea attests that at no time related to his incident did Plaintiff ever request protective custody due to issues he was having with inmate Crawford, nor was he aware at any time prior to the altercation at issue that either Crawford or the Plaintiff were under threat of substantial risk of serious harm.  Bethea attests that based on his recollection, personal knowledge,

---

[7]Also spelled "Betha" by Plaintiff in the Complaint.



and review of the documents relating to this matter, the incident at issue in this lawsuit was escalated by Plaintiff calling Crawford "retarded", by Plaintiff saying to Crawford "we handle this later", by other inmates' "jeers" or "cat-calling", and by Plaintiff's physical movement towards Inmate Crawford after having called him "retarded" and telling him that "we can handle this later". Bethea attests that regardless of whether or not Plaintiff started the fight, he unequivocally contributed to the escalation of the situation, which culminated in Plaintiff being punched by Crawford because Crawford felt threatened and acted in self defense.  See generally, Bethea Affidavit

       The Defendant Willie Eagleton has submitted an affidavit wherein he attests that he is the Warden at ECI.  Eagleton attests that he does not specifically recall meeting with the Plaintiff regarding Plaintiff's complaints about Crawford, as Plaintiff alleges in his Complaint.  Even so, Eagleton attests that in such situations it is his practice to meet with inmates to assess the situation and determine what steps are necessary, and that if Plaintiff or any other inmate told him they wanted to be moved because of safety concerns with their roommate, he would have ordered the inmate to be moved.  However, inmate cell reassignments due to incompatibility, which are done pursuant to OP 21-04 §48.3 "Inmate Request for Housing Assignment", are subject to bed space availability, compatibility with potential new cell mates, approval by the classification committee, and the need to house incoming inmates, and that during the time period at issue there was a wait list for cell reassignments based on incompatibility that was further complicated by the fact that Cheraw Unit B Wing is a handicapped Unit, which creates further restrictions on where an inmate could or could not be housed.  Eagleton further attests that while OP 21-04 §48.3 does provide for emergency housing changes, that is a reference to a housing change outside of an inmate's annual review, not housing changes necessitated by concerns over an inmate's safety or one which will occur immediately.  Rather, OP 21-17, which in turn refers to OP 22-23 "Statewide protective



custody", governs situations in which inmate safety is a concern.

Eagleton attests that OP 22-23 requires that any inmate for whom safety and security is a concern must be housed in the SMU, apart from the general population. Eagleton attests that there are two ways that an inmate can be initially placed in the SMU for safety concerns: 1) the inmate has requested protective custody; or 2) the Warden/Duty Warden or approved designee has determined that the inmate is at risk and may require a higher degree of safety and security, and an investigation must be conduced to substantiate the inmate's need for protective custody. Eagleton attests that at no time related to this incident did the Plaintiff ever request to be placed in protective custody, even after the altercation with Crawford.

Eagleton attests that inmates are constantly seeking new cell assignments, and that disagreements between cell mates are also common. Eagleton attests that most complaints related to cell mates received by case workers do not involve a Request for Protection or a Report to the Duty Warden or an Incident Report and are either an attempt to get a new cell or cell mate or are related to a minor dispute that is resolved by the inmates themselves without further issue. Eagleton attests that he is unable to locate any evidence to support Plaintiff's claim that the SCDC was aware of a threat of substantial risk of serious harm to him, and that his review of the documents related to the incident at issue as well as his recollection of these events and personal knowledge of the inmates involved shows that this incident was escalated by the Plaintiff calling Crawford names and indicated that they would handle the matter later, all in conjunction with Plaintiff's physical movement towards Crawford, which led Crawford to punch the Plaintiff due to feeling threatened and acting in self defense. See generally, Eagleton Affidavit.

The Defendant James Sligh has submitted an affidavit wherein he attests that he was the Regional Director at the time of the incident at issue, and that in this position he was rarely



involved in day to day disputes raised by inmates. Sligh attests that whenever he did directly receive a report of a threat to an inmate, he would instruct the inmate reporting the threat to talk with a unit counselor or another local SCDC employee, and that [he] would also report the threat to the appropriate SCDC official at the respective institution. However, Sligh attests that he was not aware at any time prior to the altercation between Plaintiff and Crawford that either individual was under threat of substantial risk of serious harm because they were housed together. Sligh further attests that in his opinion after review of the various incident reports and statements of record, that Plaintiff unequivocally contributed to the escalation of the situation, which culminated with him being punched because Inmate Crawford felt the need to act in self defense. Sligh attests that this conclusion is in line with the department's investigation of this matter as is set forth in the response to Plaintiff's Step 2 grievance, where the grievance branch concluded that Plaintiff had intentionally created a situation to be assaulted in order to file another lawsuit. See generally, Sligh Affidavit.

The Defendants have also submitted an affidavit from Kennethia Freeman, who attests that at the time set forth in the Complaint she was a Sergeant at ECI. Freeman attests that she is familiar with the allegations and evidence related to the incident at issue, and that her description of the incident in her report is consistent with her recollection. Freeman attests that in her experience inmates are constantly trying to "play games" with the system, often with the desire to get a different cell or be assigned to another unit or another prison. Freeman further attests that minor disputes among inmates, particularly cell mates, are very common, and that the incident at issue in this lawsuit started with Crawford's discovery of water on his Bible, with the entire incident happening very quickly and taking less than two minutes from start to finish.

Freeman attests that this incident was the result of a misunderstanding between Ferola and Crawford over Ferola spilling water on Crawford's Bible, which was then escalated by



9

Plaintiff's aggressive and abrasive reactions and other inmates' encouragement and cat calling. Freeman attests that both Plaintiff and Crawford contributed to this incident, and that based on her personal observation of the incident, her investigation of the incident, and her review of the documents related to this matter, she believes that Crawford felt threatened by Plaintiff and struck him in self defense. Freeman attests that the incident evolved from a typical inmate disagreement that could be effectively handled by verbal commands to a physical altercation so quickly that she was not able to spray the inmates with pepper spray before Crawford struck the Plaintiff. See generally, Freeman Affidavit.

The Defendants have also submitted a copy of Freeman's incident report relating to this incident, which is consistent with the statements in her affidavit, as well as a copy of an affidavit from Inmate Phillip Crawford. Crawford attests that he lived with the Plaintiff at ECI from October 2013 to January 2014, and that on the day of the incident at issue Plaintiff hung his wet sheets so they were dripping on Crawford's things, including his Bible. Crawford attests that he went to tell the Duty Officer, Sergeant Freeman, so as to avoid a conflict with the Plaintiff, but that Plaintiff followed him and was "getting up in my face, yelling at me". Crawford attests that he felt threatened by the Plaintiff, so he struck him in the face. Crawford further attests that after this fight, he [Crawford] requested protective custody because he thought he and the Plaintiff would get into another fight. See generally, Crawford Affidavit.

The Defendants have also submitted copies of Plaintiff's Step 1 and Step 2 grievance forms relating to his grievance from September 2009; documents (statements from other inmates) indicating that Plaintiff and Crawford were "having words" when Crawford punched the Plaintiff, but that Plaintiff did not fight back; a Request to Staff Member form dated January 18, 2014 wherein Plaintiff was advised that the charges that had been filed against him had been dismissed; a copy of



Plaintiff's Step 1 and Step 2 grievance forms for Grievance ECI-59-14; and a copy of a portion of

the SCDC cell assignment policy.

        The Defendants have also submitted a copy of a typed report from Ann Hallman

(apparently an investigation report relating to Plaintiff's Grievance ECI-59-14), which sets forth the

following "facts":

> On Saturday, January 11, 2014, at approximately 11:00 a.m., Sgt. K. Freeman was
> doing a security check Cheraw Unit B Wing.  I/M Crawford Phillip . . . approached
> [Freeman] and stated that [Plaintiff] spilled water on his Bible.  I/M Crawford then
> walked away.  [Freeman] asked [Plaintiff] about the incident and he stated nothing
> was wrong, I/M Crawford was retarded.  [Plaintiff] started walking towards I/M
> Crawford stating "we can save this for later".  [Freeman] had given [Plaintiff] a
> directive to stop walking towards Crawford but [Plaintiff] continued to walk towards
> I/M Crawford.  Inmate Crawford punched [Plaintiff] in the facial area.  [Freeman]
> had given both inmates another directive to cease their actions and they refused to
> comply.  Sgt. Freeman administered Sabre red pepper spray towards both inmates
> facial area and both inmates complied.  They was seen by medical and charged
> accordingly.

This document also indicates that a total of 17.4 grams of pepper spray was used during this

incident, and contains a conclusion which reads: "It does not appear that Classification made a

mistake but [Plaintiff] intentionally created a situation to be assaulted in order to file a law suit

again".

        The Defendants have also submitted copies of Plaintiff's responses to Defendants'

requests to admit.  In his responses, Plaintiff states that he did not see Crawford's Bible on the floor

and that he apologized to Crawford for his wet sheet dripping on the Bible, that it was not an

intentional act, that both inmates exchanged insults with each other but that Crawford was the one

who began the insults and confrontation, and that he stopped walking towards Crawford when told

to do so but that Crawford continued towards him and punched him.

        The Defendants have also submitted an affidavit from Dwight Hips who attests that

during the relevant time period he was a Lieutenant at ECI in charge of Cheraw B Unit.  Hips attests



that he does not specifically recall conversing with the Plaintiff with regard to complaints about his cell mate, Inmate Crawford, as Plaintiff claims in his deposition, but that if Plaintiff or any other inmate came to him to tell him he was being verbally assaulted or threatened by any inmate, particularly their cell mate, that he would have written a report to document the issue. <u>See generally</u>, <u>Hips Affidavit</u>.

        The Defendants have also submitted copies of Plaintiff's medical summaries for the relevant time period, which reflect that Plaintiff was frequently seen at sick call during the time period from September 2013 through January 2014 for a variety of ailments and complaint. The medical entry for January 11, 2014 shows that Plaintiff was seen in medical for observation "post chemical munitions". This medical entry states: "Inmate was in an altercation with another inmate. Quarter sized abrasion and knot noted to right side of forehead. Eyes rinsed with water and abrasion cleaned with soap and water. Breathing even and non-labored".

        Finally, the Defendants have also submitted excerpts from Plaintiff's deposition. Plaintiff testified that he never got along with Crawford because he had a bottom bunk pass and Crawford "didn't want to give up the bed", so he had to go get an officer to tell Crawford to move. Plaintiff testified that following this incident, Crawford told him that they were going to have a problem, and that either Plaintiff was going to give him back that bunk or "I am going to beat you up". Plaintiff testified that he responded "Go ahead". Plaintiff testified that he "went and complained" the next day, but acknowledges that he did not request to be moved to protective custody. Plaintiff testified that they don't have protective custody at ECI, but that he "went to the Unit Case Worker and requested that she move [him] or move [Crawford] because we are incompatible". <u>Plaintiff's Deposition</u>, pp. 32-33. Plaintiff testified that at ECI they put people in the lockup [SMU] for protective custody, but when asked why he did not request to be put in the



lock up, Plaintiff testified that prison officials indicated they were going to move him, so the problem was resolved, but that they "never did". Plaintiff further testified that after he had complained to authorities, "they" (apparently his roommates) started locking him out of the room. Plaintiff testified that he met with the Warden in November 2013 to request that he be moved out of his room "away from them two inmates", and that Eagleton told Bethea to "move the man out of the room today". Id., pp. 35-36. Plaintiff alleges that when he was not moved, he filed a grievance, but was advised that the issue was ungrievable. Plaintiff alleges that he then talked to a "Major West" and stated "I am asking you to move me out of the room because the man is now putting his hands on me". However, Plaintiff still did not sign any paperwork asking to be placed into lockup, nor did he ever ask for or receive any paperwork to submit asking to be placed in lock up. Id., pp. 36-37.

　　　　Plaintiff was also asked about the allegation in his Complaint that in October 2013 he asked Styles and Bethea to have him moved to another room because he and his current roommates were not compatible under the SCDC classification plan. When asked how he knew that he and his roommates were not compatible, Plaintiff testified "[b]ecause he [apparently Crawford] has an excessive record for assault". Id., p. 39. Plaintiff also testified about a conversation he and, apparently, Crawford had with Styles together. Plaintiff was asked whether at any point during this conversation with Styles did either inmate say that they were "going to start beating the hell out of each other", to which Plaintiff answered "no". Plaintiff was then asked whether he had any evidence that Styles thought this was anything more than just the two of them did not like each other, and Plaintiff answered "no". Plaintiff was also asked whether he told Styles that he thought Crawford was going to hit him, beat him up, or hurt him, and Plaintiff answered "no". Id., p. 48.

　　　　Plaintiff testified that he then went to Bethea and told him that both he and Crawford



had asked Styles for a room change because they were incompatible and did not get along, and that Bethea responded that he did not override his case workers in the Unit.  Plaintiff testified that Bethea was also told by Major West and Warden Eagleton to move him, but that he never did.  Id., p. 49. However, when Plaintiff was asked if he had ever told Bethea that he thought Crawford was going to hit him, or punch him, or hurt, he said he had told Bethea that Crawford was "pushing me and locking me out of the room", but that "it hadn't got to no punches".  Id., p. 51.

Plaintiff testified that he followed the chain of command and eventually ended up in Eagleton's office.  Id., p. 60.  Plaintiff also again acknowledged that he never requested protective custody, and even testified that when he was offered protective custody in January, he refused it. Id., pp. 60-61.  When asked why he had refused protective custody, Plaintiff testified that Crawford had been placed in the lockup so there was no need for him [Plaintiff] to request protective custody at that point.  When asked if he knew that Crawford had requested protective custody, Plaintiff testified that that was a "formality".  Id., p. 61.  Plaintiff acknowledges that the paperwork shows that Crawford requested protective custody but that "there was no way that man requested protective custody . . . . He was placed in lockup for assault on me".  Id., pp. 61-62.

With respect to the specific incident alleged in the Complaint, Plaintiff testified that the entire thing was a "misunderstanding" and that Crawford "thought I did something deliberately to him, and I didn't".  Id., p. 72.  Plaintiff testified that Crawford came up to him and asked him why he had deliberately poured water on his Bible, and that he [Plaintiff] apologized.  Plaintiff testified that other inmates then "started blundering him up" to get him to act, and that he then went to Sgt. Freeman and told her that "[t]hat psycho right there just poured water on my Bible".  Plaintiff testified that when Freeman asked him "What's the situation?", he said "that man's retarded.  I have already apologized to him.  I didn't do it deliberately.  It was an accident.  I didn't see his Bible".



Id., p. 73.  Plaintiff testified that Crawford then started walking back upstairs and was screaming at him indicating that he was going to punch him, at which time Plaintiff responded "Look, we can save it for later" and that they would talk about it in the room.  Plaintiff testified that at that point Crawford started coming back down the stairs talking that he was going to hit him, so he [Plaintiff] started walking towards Crawford "talking garbage back to him".  Plaintiff testified that when Freeman told him to stop, he stopped, but that Crawford continued down the stairs, came up to him and punched him in the face.  Id., p. 74.  Plaintiff later testified that when Crawford said "I will punch you in the face", that he [Plaintiff] responded "Do what you got to do".  Id., p. 77.

When Plaintiff was asked: "By your account, you calling him a retard caused him to stop in his tracks, turn around, and come back down"?, Plaintiff answered "Yeah, I did call him a retard.  Yes, I did call him that".  Id., p. 78.  Plaintiff testified that when Crawford hit him it caused him to fall against the wall.  Id., p. 79.  Plaintiff also acknowledged that Crawford "might have mistook what I said and that's why he came back down", that when he told Crawford that they would deal with it later when they got back to the room, that "he might have mistook that I was trying to threaten him and that is why he turned around.  I can't answer for him".  Id., p. 80.  Plaintiff also testified that the incident should have never happened, and that "the inmates bullied him.  The inmates battered him up . . . . They kept edging him on until he did that".  Id., p. 81.  Even so, Plaintiff contends that the Defendants should be liable for what happened because "had they done their job and separated us when we asked to be separated, which was no big deal . . . . this would have never occurred.  Id., pp. 81-82.  See generally, Plaintiff's Deposition.

As attachments to his response in opposition to summary judgment, Plaintiff has submitted a copy of a cell assignment form from October 2013 showing where Plaintiff, Crawford, and the third inmate (Steve Wilson) were assigned to the same cell.  This exhibit shows that while



Wilson had a separation requirement, neither Crawford or the Plaintiff did.  This exhibit further shows that Plaintiff was the only inmate out of the three that had convictions for assault on other inmates or staff.  No inmate had any PREA (sex behavior/victimization) issues.  Under the comment section, it was noted that Plaintiff had a conviction for fighting without a weapon, while no issues were noted with respect to either Crawford or Wilson.  See Plaintiff's Exhibit A.

Plaintiff has also submitted a copy of a Request to Staff addressed to Eagleton dated November 17, 2013, noting that pursuant to their conversation of the previous week either the Plaintiff or his roommates were going to be moved, but that this "has not been done as of yet".  Plaintiff noted that he had told Eagleton that he had been pushed several times by Crawford and was being locked out of his room by both inmates and denied access to the bottom bunk.  Plaintiff asked that Eagleton "please resolve this matter at once".  See Plaintiff's Exhibit B.

Plaintiff has also submitted a copy of a notice of Crawford's placement in the "PHD" by Major West on January 11, 2014 (Plaintiff's Exhibit C), a copy of a "lock-up checklist" dated November 11, 2014 (Plaintiff's Exhibit D), a copy of a Disciplinary System document relating to the Plaintiff dated January 16, 2014 (Plaintiff's Exhibit E), a Request to Staff form dated January 15, 2014 from Plaintiff to SMU case worker Mattox asking that if Crawford was released from the SMU that he not be placed back in the cell with the Plaintiff since Plaintiff was in the process of filing a lawsuit against Crawford for assault and battery, and bearing the response "Based on the incident report both of you were charged with fighting.  I do not put I/M's involved in a fight back together" (Plaintiff's Exhibit F), and a copy of the Medical Summary Report of January 11, 2014 [previously discussed as part of the Defendants' evidence] showing that Plaintiff suffered only superficial injuries as a result of this incident (Plaintiff's Exhibit G).

Plaintiff has also submitted copies of the Defendants' responses to his interrogatories.



16

In response to the question (Interrogatory No. 4) "Please state whether you have the authority to separate inmates who become incompatible under SCDC Policy OP 21-04", Defendants answered "SCDC Policy OP 21-04 is listed as the Classifications Policy for the Department of Corrections. The Defendants defer to the language within Policy OP 21-04 for the authority granted to the Department therein".  In response to the question (Interrogatory No. 6) "Please state whether Plaintiff requested to be moved to another room at any time prior to January 11, 2014", Defendants responded, in part, "the Defendants are informed and believed that the Plaintiff did request a room change prior to the incident".  In response to the question (Interrogatory No. 11) "Did you release . . . and place inmate Crawford back into the same Unit (Cheraw) . . . with Plaintiff after Plaintiff was assaulted by Inmate Crawford", Defendants responded "The movement of inmates after the incident giving rise to this litigation has no bearing on whether or not the Defendants were aware that the Plaintiff was under a substantial risk of serious harm prior to the incident at issue".  In response to the question (Interrogatory No. 22) "If you contend Plaintiff refused protective custody please state the name, title, of any Defendant who offered Plaintiff protective custody, all refusal forms plaintiff signed and the date offered to plaintiff", Defendants responded "The Defendants are unaware of any documents indicating that the Plaintiff ever requested protective custody pursuant to the established procedure at Evans Correctional".

In response to a Request to Admit (No. 10) asking "please admit, inmates who seek protection from each other are not placed back together in the same Unit", Defendants responded "Qualified admit.  Inmates who are determined to be a threat to one another are not returned to the same cell as roommates".  In response to a Request to Admit (No. 2) asking "Please admit, between the period of late October 2013 to December 2013 Plaintiff requested to be moved out of room 211(B) to another room because of incompatibility [sic] with his roommates", Defendants responded



"Qualified admit. The Defendants will admit that Plaintiff requested to be reassigned to a different cell during the time periods noted above, however, these Defendants maintain that the Plaintiff never presented any requests to SCDC officials that he be moved due to [a] serious threat to the Plaintiff's health or safety". See generally, Plaintiff's Exhibits.[8]

### Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review and consideration of the evidence and arguments presented, the

---

[8]In response to a previous court order, the Court also received certain documents from the Defendants for in camera review relating to the Defendants' knowledge of Inmate Crawford having a propensity for violence and/or animosity against the Plaintiff, if any. A review of these documents reflect that Crawford has a criminal history involving crimes considered both violent and non-violent, including drug convictions. To the extent Crawford incurred any disciplinary charges while an inmate with the SCDC, these documents reflect that any inmate disciplinary violations with which Crawford was or has been charged all post-date the incident at issue in this lawsuit.



undersigned concludes for the reasons set forth hereinbelow that the Defendants are entitled to summary judgment in case.

In order to proceed on a failure to protect claim, the evidence must be sufficient to give rise to a genuine issue of fact as to whether any named Defendant was deliberately indifferent to a specific known risk of harm to the Plaintiff. See Pruitt v. Moore, No. 02-395, 2003 WL 23851094, at * 9 (D.S.C. Jul. 7, 2003)[Deliberate or callous indifference on the part of prison officials to a specific known risk of harm states an Eighth Amendment claim], cert. denied, 2004 WL 232748 (4th Cir. 2004); Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. Mar. 11, 1997) ["A defendant acts with deliberate indifference . . . if he or she 'knows of and disregards' an excessive risk to inmate health or safety]; Chisolm v. Associate Warden Thompson, No. 15-1806, 2016 WL 4394276 at * 8 (D.S.C. Aug. 18, 2016) ["In order to establish a failure to protect claim, an inmate must establish: 1) the deprivation alleged must be objectively 'sufficiently serious', and 2) the prison official must have acted with a sufficiently culpable state of mind".] (citing Prince v. Salsser, 65 F.3d 342, 345 (4th Cir. 1995)). The Defendant against whom the claim is being asserted "must have both been aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and . . . [they] must have also drawn that inference". Farmer v. Brennan, 511 U.S. 825, 837 (1994).[9]

The Supreme Court has held that a plaintiff can make out a prima facie case of deliberate indifference by showing "that a substantial risk of [serious harm] was long standing, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances

---

[9]Defendants initially argue as grounds for dismissal of this case that the Plaintiff failed to exhaust his administrative remedies on this claim before filing this lawsuit. However, Plaintiff's grievance ECI -59-14 specifically references this issue, and Plaintiff exhausted his remedies with respect to this issue through the Step 2 grievance appeal level, which is all he was required to do to exhaust his administrative remedies. See also, n. 4, supra.



suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it". <u>Farmer</u>, 511 U. S. at 842. However, this "deliberate indifference" standard is a "very high standard - a showing of mere negligence will not meet it". <u>Grayson v. Peed</u>, 195 F.3d 692, 695 (4th Cir. 1999); <u>see</u> <u>also</u> <u>A.P. ex rel. Bazerman v. Feaver</u>, No. 04-15645, 2008 WL 3870697 at *12 (11th Cir. Aug. 21, 2008)["[D]eliberate indifference requires a much higher standard of fault than mere or even gross negligence . . . ."]; <u>Danser v. Stanberry</u>, 777 F.3d 340, 346-347 (4th Cir. 2014)[Plaintiff must "establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" and "that the prison official allegedly violating [P]laintiff's constitutional rights had a sufficiently culpable state of mind"] (internal citation omitted) [vacating district court's order denying summary judgment and remanding with instructions to enter summary judgment]. Plaintiff has failed to meet this exacting standard in this case.

Plaintiff alleges that the Defendants should be liable because all of them knew that both he and Crawford had asked to be placed in different cells because they were incompatible, that at least on a couple of occasions Crawford had "pushed" him, and that Crawford and his other roommate (White) were repeatedly locking him out of the cell. However, even assuming Plaintiff's statements in his verified Complaint as well as his deposition setting forth this same information to be true for purposes of summary judgment, the evidence is not sufficient to establish that any named Defendant in this case was deliberately or callously indifferent to a specific known risk of harm to the Plaintiff. That Plaintiff and his cell mate did not get along is not sufficient to state a claim or to show that Plaintiff was being subjected to an excessive risk to his health or safety. Plaintiff himself conceded in his deposition testimony that Crawford had never previously struck him, that he had never requested protective custody, that he never told prison officials that they were going



to "start beating the hell out of each other", and that he never told prison officials that Crawford was going to hit or hurt him.  Rather, it is readily apparent from the evidence (including Plaintiff's own evidence) that he and Crawford simply did not like each other, and wanted to be placed in separate cells.  Eagleton even indicated that he would do so, but there is no indication in the evidence before this Court that there was any need for cell reassignments to be made immediately on an emergency basis, or that any need to have either Plaintiff or Crawford moved to protective custody lockup prior to the incident at issue would have been appropriate (especially in light of the fact that neither Plaintiff nor Crawford had requested such action).  Indeed, the incident which gives rise to this lawsuit did not even occur until months later, an event for which even Plaintiff concedes he was partly to blame.  <u>Cf</u>. <u>Paks v. City of New York</u>, No. 04-2490, 2006 WL 944659 at * 6 (S.D.N.Y. Apr. 11, 2006) [Finding, in part, that Plaintiff's role as an instigator of the altercation relevant to failure to show a claim for failure to protect]; <u>Hailey v. Kaiser</u>, 201 F.3d 447 (10th Cir. 1999) [Finding no causation under § 1983 where plaintiff admitted that he could have avoided the other inmate, but chose to confront him instead].

While Plaintiff complains that it is the Defendants' fault that Crawford hit him on the day in question, the evidence presented to this Court (again, including Plaintiff's own evidence to include his deposition testimony) reflects that Plaintiff was a full participant in the incident at issue, which was in any event not the result of any previous threat Crawford had made against the Plaintiff, and certainly not one involving conduct which any Defendant was aware of prior to it happening.  <u>Lemmons v. Durant</u>, No. 10-3030, 2011 WL 4633104 at * 3 (C.D.Ill. Oct. 4, 2011) [summary judgment granted on failure to protect claim where plaintiff put himself in harm's way when he chose to come out of his room and confront other inmate in an aggressive manner when he could have avoided the situation by staying in his room or contacting staff]; <u>Clark v. Johnson</u>, 181



21

Fed. Appx. 606, 607 (7th Cir. 2006) [Noting that "[t]he risk to [plaintiff] was of his own making , and prison officials cannot reasonably be required to protect an inmate who intentionally instigates a violent altercation with another prisoner".].  It is simply a truism that state prisons are dangerous places - and there is nothing remarkable about Plaintiff being housed with other individuals with criminal backgrounds and histories - that is why they are all there.  However, Plaintiff has provided no evidence to show that any named Defendant could or did have any forewarning that Plaintiff and Crawford would be involved in an altercation on January 11, 2014.  Cf. Parrish v. ex rel. Lee v. Cleveland, 372 F.3d 294, 302-303 (4th Cir. 2004)[Situation must be evaluated as the officers reasonably perceived it, "not as it now may be perceived enlightened by the benefit of hindsight"]; Drayton v. Cohen, No. 10-3171, 2012 WL 666839 at * 7 (D.S.C. Feb. 29, 2012) [granting summary judgment on a failure to protect claim], aff'd, 474 Fed.App'x. 991 (4th cir. Aug. 6, 2012); Carter v. Galloway, 32 F.3d 1346, 1349-1350 (11th Cir. 2003) [Affirming summary judgment where Defendants knew that inmate who attacked Plaintiff was a problem inmate with a disobedience history and had been prone to violence, but Plaintiff failed to establish the Defendants had a subjective awareness of a substantial risk of serious physical threat to the Plaintiff].

Classification and cell assignment issues are uniquely within the provence of prison officials, and the Defendants cannot be held liable for classification and cell assignment decisions absent a specific known risk of harm to an inmate that they fail to address.  Neal v. Shimoda, 131 F.3d 818, 828 (9th Cir. 1997) ["[A] prisoner does not have a constitutional right to be housed at a particular institution . . ."]; cf. Norfleet v. Godinez, No. 15-160, 2015 WL 3613592 at * 5 (S.D.Ill. June 9, 2015) ["A prisoner has no right to be transferred the prison of his choice, so a complaint over a delayed transfer would likely not be actionable in and of itself."]; see generally, Chevron U.S.A. v. Natural Res. Def. Cil., Inc., 467 U.S. 837, 844 (1984) [Agency's decisions are not to be second-



22

guessed by federal courts unless they are arbitrary, capricious, or manifestly contrary to the statute]; Marchesani v. McCune, 531 F.2d 459, 462 (10th Cir. 1976), cert. denied, 429 U.S. 846 (1976)[classification generally upheld unless inmate proves arbitrary and capricious or a clear abuse of discretion]; see In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999) ["Prison officials 'should be accorded wide-ranging deference in adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security'"] (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)); Overton v. Bazzetta, 539 U.S. 126, 131 (2003) ["We must accord substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them"].

Further, even assuming Plaintiff's claim that his roommate assignments were in violation of SCDC policy to be true for purposes of summary judgment, that does not subject the Defendants to liability in this case since no constitutional violation has been found to have occurred. Keeler v. Pea, 782 F.Supp. 42, 44 (D.S.C. 1992) [violations of prison policies which fail to reach the level of a constitutional violation are not actionable under § 1983]); see also Scott v. Hamidullah, No. 05-3027, 2007 WL 904803 *5 n.6 (D.S.C. Mar. 21, 2007) (citing Riccio v. County of Fairfax, Virginia, 907 F.2d 1459, 1469 (4th Cir. 1990)); Johnson v. S.C. Dep't of Corrections, No. 06-2062, 2007 WL 904826 at *12 (D.S.C. Mar. 21, 2007) ["Plaintiff's allegation that Defendants did not follow their own policies fails, as the failure of prison officials to follow their own policies or procedures, standing alone, does not amount to a constitutional violation."] (citing Riccio, 907 F.2d at 1469 [if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue]).



Therefore, Plaintiff has failed to show that any named Defendant was deliberately indifferent to a known excessive risk to his health or safety, and the Defendants should therefore be granted summary judgment on this claim.  Levy, 1997 WL 112833 (N.D.Ill. Mar. 11, 1997)["A defendant acts with deliberate indifference . . . if he or she 'knows of and disregards' an excessive risk to inmate health or safety]; Farmer, 511 U.S. at 837[Defendant must have both been aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also have drawn that inference"]; Carter, 32 F.3d 1349-1350 [Affirming summary judgment where Defendants knew that inmate who attacked Plaintiff was a problem inmate with a disobedience history and had been prone to violence, but Plaintiff failed to establish the Defendants had a subjective awareness of a substantial risk of serious physical threat to the Plaintiff].

### **Conclusion**

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be granted, and that this case be dismissed.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

August 26, 2016
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

